Alex R. Straus (SBN: 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 Beverly Hills Drive, Penthouse
Beverly Hills, CA 90212
Telephone:   310-450-9689
Facsimile:   310-496-3176
astraus@milberg.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SANDRA L. FLOREY | Case No.  2:21-cv-7118 |
|            Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | 1. Violation of the California Unfair Competition Law, California Business & Professions Code § 17200, et seq. |
|            Defendant. | 2. Fraudulent Misrepresentation |
| | 3. Negligent Misrepresentation |
| | 4. *Quantum Meruit* |
| | 5. Unjust Enrichment |
| | 6. Punitive Damages |

Plaintiff Sandra L. Florey, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

1

**INTRODUCTION**

2    1.    For years, IBM has perpetrated an institutional bait-and-switch with

3  how it pays commissions to sales representatives and managers. Throughout IBM's

4  messaging to them, from how it directs managers to explain commissions to how it

5  uses presentations to highlight the program features, IBM consistently and

6  repeatedly represents that commissions are uncapped. Indeed, IBM's Rule 30(B)(6)

7  witness admitted under oath in depositions in similar lawsuits that IBM has "an

8  obligation" not to cap commissions payments and that it's reasonable for its

9  employees to rely on that.

10    2.    IBM tells sales representatives that ["they"] can make a million

11  dollars!" and that their income is limited only by how much they are able to sell. But

12  that's not the truth. The truth is that IBM frequently does cap commissions. And

13  IBM intentionally misleads sales representatives about the program because it

14  knows that an "uncapped commissions" program is highly motivating to sales

15  representatives and incentivizes them to pursue big deals. On the contrary, capping

16  commissions de-motivates sales representatives because when they reach the cap

17  they can't make any more commissions no matter how big the deal is. And, since a

18  big deal is often extraordinarily difficult to close, requiring long hours and repeated

19  out-of-town travel, IBM knows that being honest about its capped commissions

20  program would significantly limit the number of those big deals.

21    3.    For years, IBM has known that sales representatives, and even

22  managers, believe IBM when it says commissions are uncapped. In fact, the IBM

23  department that handles capping frequently gets calls from sales representatives

24  and managers that are upset about getting capped after being told that IBM does

25

26

27

28

not cap commissions. Yet, IBM does nothing to attempt to eliminate the problem by explaining its real practice.

4.  The reason IBM doesn't attempt to explain that it caps commissions is simple: profit. As it stands, IBM is able to have its cake and eat it too because it can successfully motivate its sales team to pursue the big deal for IBM, but never have to pay a fair commission for the extraordinary effort the sales representative expended to close it.

5.  Plaintiff Sandra ("Sandy") Florey is another victim of IBM's blatant misrepresentations and doubletalk about uncapped commissions. Despite promising Ms. Florey that her commissions were uncapped just like they were for the sales representatives that she managed, in the spring of 2018, IBM capped her commissions along with the commissions of one of her sales representatives, Bruce Reingold. She has filed this action to recover the damages she has incurred from IBM's wrongful capping of her commissions and to stop IBM's deceptive and unlawful practice. Mr. Reingold previously filed suit to recover his commissions in the Northern District of California, which was resolved to the mutual satisfaction of the parties after the close of discovery.

## PARTIES

6.  Ms. Florey is a citizen of Agoura Hills, California, residing in Los Angeles County.

7.  IBM was incorporated, and is existing, under the laws of the State of New York.   IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

8.  Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

9.      This Court has personal jurisdiction over IBM.

10.     Venue is proper in this Court.

11.     This action has been brought within all applicable statute of limitations and/or repose.

## FACTUAL ALLEGATIONS

12.     Ms. Florey began working for IBM in 1991 as a technical manager in the sales organization when her previous company was acquired by IBM.

13.     From 2000 to 2020, Ms. Florey served as a Business Unit Executive in various business units of IBM's structure.

14.     Throughout her career at IBM, as shown by her lengthy tenure in management positions, Ms. Florey was very successful and highly respected.

### IBM Promised Ms. Florey Her Commissions Were Uncapped.

15.     Compensation as an IBM sales representative consists of a base salary paired with uncapped commissions. IBM managers' compensation consists of a base salary paired with uncapped commissions based on the achievement of their sales representatives. In Ms. Florey's words, "everything the sellers sell rolls up to my achievement" as the manager.

16.     At IBM, sales representatives and managers regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth of slides and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that commissions may be capped in some instances or that IBM reserves the right to cancel or modify whether and to what extent commissions may be capped. The

Educational Materials are unequivocal and state repeatedly that commissions are uncapped. The Educational Materials were also available for salespeople and managers to download during the entirety of the sales period (January-June of 2018) and afterwards.

17.     Ms. Florey's commission plan for the first half of 2018 ran from January 1, 2018, through June 30, 2018. Mr. Reingold's commission plan (out of which his achievement would be credited to Ms. Florey's commissions) also ran from January 1, 2018, through June 30, 2018.

18.     During that same time period in 2018, Ms. Florey received and reviewed a presentation (the "PowerPoint"), which constituted a portion of the Educational Materials for the first half of 2018. IBM also made the PowerPoint available for its sales representatives and managers to download during the entirety of the sales period (January-June 2018) and afterwards, as a resource that they could continually refer back to if they had any questions about their commissions. This PowerPoint constitutes a continuing representation by IBM to sales representatives and managers about how they should understand the terms of their commissions compensation.

19.     IBM made a substantially similar version of this PowerPoint available to Ms. Florey (and Mr. Reingold) each six months for the purpose of highlighting and explaining the important terms of his compensation.

20.     The PowerPoint was titled "Your 2018 Incentive Plan Individual Quota Plan for Sellers" and it stated that the presentation was the "primary 2018 education for IBM sales employees and managers." It further stated that "[i]t covers the information you will need to understand your 2018 plan."

21.     On slide 6, is the following quote which pertains to Ms. Florey's plan type, the Individual Quota Plan:

> Managers are required to assign a territory and quota for each seller on an individual quota plan. Seller earnings for these plans are paid based upon achievement results rather than on an assessment of employee contribution.

22.     In every sales period prior to this one, the substantially similar versions of this presentation included the phrases "earnings opportunities remain uncapped" and "payments uncapped."

23.     Starting in the first half of 2018, in response to lawsuits filed by the undersigned counsel, IBM removed the phrases "earnings opportunities remain uncapped" and "payments uncapped" from this PowerPoint.

24.     Regardless, IBM's policy remains that sales commissions are uncapped and IBM has testified under oath that sales commissions remained uncapped.

25.     IBM instructs its managers to tell sales employees during the sales kickoff calls at the beginning of each sales period, and the managers actually do tell them, that commissions are uncapped.

26.     Indeed, Mr. Reingold's managers, including Jeffrey Pope, Steven Bauer, Donna Bolen, and Sandy Florey dutifully followed IBM's instructions, telling him things at the beginning of each sales period with respect to his commissions such as: "the sky is the limit," and he could "make a million dollars."

27.     Ms. Florey, Mr. Reingold's manager, told him on the phone at the beginning of the 2018 sales period that he would earn commissions in accordance with his formula, including the accelerators, and "no cap."

28.     Maria Lipner, the global head of commissions at IBM, testified recently under oath in another commissions dispute that IBM's policy during the 1H 2018 period was that commissions were uncapped.

29.     That commissions are uncapped is also reflected in the "payout tables" contained in the PowerPoint, which demonstrate that accelerators continue to apply above certain quota attainment thresholds. These payout tables do not set any upper limit for commissions, consistent with IBM's policy and representations that commissions remained uncapped.

30.     The representations that sales commissions are uncapped were often repeated in sales meetings and by IBM managers, both formally and informally.

31.     Uncapped commissions has been a core component of compensation for sales employees, including managers like Ms. Florey, who are on Individual Quota Plans for many, many years.

32.     Here, Ms. Florey's commissions were arbitrarily capped for the sole purpose of limiting her earnings in the first half of 2018.

**Ms. Florey's Commission Payments Were Capped.**

33.     In 2018, Ms. Florey was Mr. Reingold's manager at IBM. Therefore, as part of the pay structure, his achievements and any commissions on deals resulted in commissions allocated to Ms. Florey as well.

34.     In 2018, Mr. Reingold worked on behalf of IBM to close a large deal of IBM services to Bio-Rad Laboratories, Inc. ("Bio-Rad Deal"). Mr. Reingold was the only sales representative from the Security products and services team responsible for the deal.

35.     Upon information and belief, all other individuals who were a part of the Bio-Rad Deal were paid without issue.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

36.     Mr. Reingold's efforts in closing the deal resulted in total sales of security services of approximately $6,646,566, within a larger deal of approximately $83,000,000. Mr. Reingold's achievement report (IBM's internal record that reflects the revenue credit attributable to Mr. Reingold) indicated that the total sales revenue attributable to him for this deal was $6,646,566. His quota at the time for the sale of IBM services was $514,133.

37.     On the recognized revenue credit of $6,646,566, Mr. Reingold earned a commission of $277,945, which should have been paid to him in March 2018 after the deals were closed at the end of February 2018. He was not paid any of this commission in March 2018.

38.     At the time, Mr. Reingold's first-line manager was Plaintiff Sandy Florey, and his second-line manager (i.e. Florey's boss) was Suzanne Henkels.

39.     Bio-Rad was an account that Mr. Reingold was assigned and that he had been calling upon since 2016. In the second half of 2017, Mr. Reingold helped work on the deal that ultimately closed in February of 2018.

40.     By the end of 2017, it was clear that the deal would likely be closing during the first half of 2018.

41.     In early January of 2018, Mr. Reingold met with his manager, Ms. Florey, and she presented him with three different compensation plan options. Together, they decided that he should be on the Individual Quota Plan (IQP) that he ultimately selected because: (1) he had contributed to the relationship with Bio-Rad; (2) he had contributed to the deal that was being negotiated at that time; (3) he deserved to be paid if that deal closed; (4) he could drive the most revenue to IBM under this plan; and (5) on an IQP like that one, per the PowerPoint, he would be

paid based upon achievement results rather than on an assessment of employee contribution if the deal closed.

42.     Moreover, they specifically discussed the amount of his compensation under each of the plans, and Ms. Florey told him that if he chose the IQP that he ultimately selected, he would exceed his quota in the event the Bio-Rad Deal closed at the approximately $7,000,000 they thought it might, and he would receive payment per the formula in his plan, including the accelerators, and "no cap."

43.     Based on the three plan options, Ms. Florey and Mr. Reingold discussed that the IQP would allow him to drive the most revenue to IBM and therefore compensation for both product and services.  This role of Security Client Executive (SCE) was offered to Mr. Reingold by IBM based on its decision that this was something that made sense in key large accounts and that IBM wanted senior salespeople like Mr. Reingold to take on this role.  This role was only offered to a subset of sellers like him and this was presented as an opportunity to make a larger contribution to the Security organization by representing and selling Security Services in addition to Security products.

44.     However, after the deal closed, and Mr. Reingold was due to be paid $277,945, his second line manager, Ms. Henkels, informed Ms. Florey that he would be paid a lot less than that. She cited nothing in IBM's commissions plan that could justify that decision.

45.     As a result, Ms. Henkels unilaterally decided to only pay him $11,530.13 for this deal.

46.     The only reason Ms. Henkels provided to his boss, Ms. Florey, was that in her opinion, Mr. Reingold didn't deserve to be paid $277,945 because he hadn't done that much work to close the deal. Ms. Florey further told Mr. Reingold that

Ms. Henkels said that "it wouldn't look good if [she] paid this much to [her] salespeople."

47.     This did not make any sense to Mr. Reingold because IBM clearly told him that his contribution to close a deal was not a factor in determining what commissions were due to him and that his commissions were uncapped.

48.     IBM did not shift or pay to any other sales representatives the money that it improperly withheld from him. IBM simply kept that money for itself.

49.     Further, there was another sales representative, Rob Israel in Security Services whose contribution to this deal was similar to Mr. Reingold's; yet, Mr. Israel was paid in full, even though Mr. Reingold had spent considerably more time than Mr. Israel had selling to Bio-Rad and building that relationship over the previous 2 years.

50.     The Bio-Rad deal generated commissions to Ms. Florey of approximately $180,580.62.

51.     However, Ms. Florey's commissions were capped in accordance with Mr. Reingold's cap.

52.     Rather than receiving her full commission, IBM capped her commissions to about 8% of what she was owed.

53.     Instead of $180,580.62, Ms. Florey was only paid about $14,000 in commissions.

### Mr. Reingold Filed Suit to Recover His Unpaid Commissions

54.     Before Ms. Florey filed this pending action, Mr. Reingold filed his own case against IBM for unpaid commissions. *See Reingold v. IBM*, 3:20-cv-05850-RS (N.D. Cal.).

55.     Ms. Henkels admitted in a 30(b)(6) deposition taken in Mr. Reingold's case that she capped his commissions. *See* **Ex. A**, Henkels Depo. at 9:7-8, 9:11 ("Did you cap Bruce Reingold's commissions on the Bio-Rad deal? Yes.").

56.     This was even after a commissions department employee told her "we can't cap payments." *See* Ex. A, Henkels Depo. at 17-20.

57.     Ms. Henkels, however, further admitted that under the IPL, commissions are paid upon achievement results and not contribution to the sale. See Ex. A, Henkels Depo. At 70:3-18. She also admitted it was reasonable for employees to rely on what IBM tells them about their compensation plan. *See* Ex. A, Henkels Depo. at 70:19-23.

58.     IBM's other Rule 30(b)(6) witness, Karla Johnson the head of IBM's North American commissions department, testified that if a sales manager caps commissions, that would violate IBM policy. When informed of Ms. Henkels' testimony, Ms. Johnson testified that Ms. Henkels was incorrect that IBM's policy allowed commissions to be capped at IBM. *See* **Ex. B** Johnson Depo. At 15-19.

59.     But, Ms. Henkels' unilateral decision to cap Mr. Reingold's commissions led to Ms. Florey's commissions being capped as well. *See* **Ex. C**, Florey Depo. at 55:14-16 ("And [my commission] was capped as well, right? Because everything that the sellers sell rolls up to my achievement as well.")

60.     Ms. Henkels confirmed in her deposition that Ms. Florey's commission was capped because it was tied to the cap on Mr. Reingold's commission. *See* Ex. A, Henkels Depo. at 132:15.

61.     Again, when not giving this money to Ms. Florey (and not giving it to anyone else), IBM kept the money for added profit.

## **Ms. Florey Has Recently Learned That IBM**

**Routinely Misrepresents That It Does Not Cap Commissions**

62.    Recently, aside from the information gained in Mr. Reingold's case, Ms. Florey has learned that IBM has a history of capping commissions.

63.    The sales field in which Ms. Florey worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its sales representatives and managers that commissions could be capped, it would be severely hampered in its efforts to recruit good sales representatives. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high achievers after the fact.

64.    There are other cases that have been filed around the country, including in the Middle District of North Carolina, and the Northern District of California that are very similar to this one and that have yielded significant discovery. One of those cases is <u>Bobby Choplin v. International Business Machines Corporation</u>, No. 16-cv-1412-TDS-JEP ("the Choplin Action"), which was recently resolved. The plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Ms. Florey's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to them. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Ms. Florey, and what IBM actually paid her and why.

65.    In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti; (2) a

deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany; (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki; and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation). Together, these are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Ms. Florey here.

66. The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for sales employees like Mr. Choplin and Ms. Florey; (2) sales employees like Ms. Florey were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Ms. Florey, was "capping."  For example:

a. IBM testified as follows:

Q. The fourth bullet point, you could read that, please.

A. "Earnings opportunity remains uncapped."

Q. Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?

A. Correct.

Q. Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?

1

2          A. Correct.

3          Q. So would you agree that IBM had an obligation not to cap Bobby
              Choplin's earnings opportunity?

4          A. Yes.

5          Q. Would you agree that IBM had an obligation not to cap Bobby
              Choplin's payments?

6

7          A. Correct.

8

9      When asked specifically about whether a salesperson could reasonably rely on the

10     statements in the PowerPoints, IBM testified:

11         Q. And it would be reasonable for a salesperson like Bobby Choplin
              to rely on the information in Exhibit 65, 66 and 67 [PowerPoints]
12            regarding their compensation plan?

13         A. Yes.

14         b. Mr. Batthany testified as follows about the statements in the

15            PowerPoint that commission would be not be capped:

16         Q. Okay. It would be reasonable for someone to understand that
              their commission payments were uncapped in the first half of
17            2015, wouldn't it?

18         A. Yes.

19

20     Mr. Dorsey similarly testified that, if he were a salesperson and read the statements

21     in the PowerPoint, he would think that his earnings were uncapped.

22

23         c. Ms. Maleki testified as follows about what exactly constitutes capping:

24         Q. What does that mean to you?

25         A. Capped?

26         Q. Right.

27

28
                              COMPLAINT
                              Page 14 of 35

A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.

Q. Something different than what your commission formula would produce?

A. Correct.

Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.

…

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

67.    The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments,

IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments.

68.    Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000.

69.    IBM's Rule 30(b)(6) designee in the Choplin case testified that IBM is not "capping" commissions, only "adjusting" them. He further testified that "as long as IBM's adjustments are to a specific deal and not all deals, IBM's position is that's not a cap."

70.    Contrary to Mr. Martinotti's testimony on behalf of IBM, other IBM employees, including managers, executives, and sales representatives, are totally unaware of the distinction that IBM attempts to make between a "cap" and an "adjustment" and almost exclusively refer to what IBM does as "capping" or a "cap" on commissions. Indeed, as noted above, they use that exact word in their internal emails.

71.    IBM claims that this usage of the word "cap" is a "mistake." On behalf of IBM, Mr. Martinotti testified that sales representatives, managers, and other executives within IBM commonly use the term "capped" but shouldn't be using that term; they should be using the term "adjusted" instead. Specifically, he testified:

Q:    Have you had anyone at IBM come to you after an adjustment and say, you know, "IBM capped me on this deal?"

A:    And I would go back to them and say that they didn't cap you; they adjusted you.

Q.    Okay. So, first, let me – that has happened?

1

A.    Yes.

2

Q.    Okay. So you would agree there is some confusion about the difference between a cap and an adjustment of commissions?

3

4

A.    The answer is yes, there is confusion or, said differently, they use the term interchangeably incorrectly.

5

6

Q.    Who is "they"?

7

A.    The sales representatives.

8

Q.    Okay, okay. You think – and managers too right?

9

10

A.    Right. **Every adjustment they consider to be a cap**, and that's no – you know, a cap is not an adjustment and adjustment is not a cap.

11

12

72.    IBM also testified that executives such as Mr. Moorer (the executive

13

actually responsible for determining whether and how much to cap Mr. Choplin's

14

commissions on the BB&T Deal), are similarly mistaken when they use the term

15

cap:

Q:    So Mr. Moorer here is using the word "cap" and "capping" isn't he?

16

17

A:    Correct. He is using the word "capping."

18

Q.    Okay. He is making that mistake that you would correct him on, right?

19

20

A.    Exactly.

21

Q.    But Mr. Moorer is the one – is one of the people who exercises judgment on those of how much or how little to pay in commissions, right?

22

23

A.    Yes.

24

73.    Despite IBM's contention that its sales representatives, managers, and

25

executives are all "confused" and "mistaken" when they refer to IBM's conduct as

26

"capping" commissions, IBM makes no efforts to clarify the confusion in its 200

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

pages of Educational Materials. Indeed, none of the Educational Materials (where IBM repeatedly promises commissions are uncapped) contain any qualifiers or fine print of any kind.

74.    IBM does not clarify this confusion because it knows that if sales representatives knew that IBM might cap their commissions, it would demotivate the representatives and lead to lower sales for IBM.

75.    IBM has even been told by its managers that it cannot continue to make representations like that in light of IBM's actual practices. One manager, Tom Batthany, wrote an email protesting IBM capping the commissions of a sales representatives he managed, where he says: "We can no longer have folks stand in the front of the room and say reps make $1 million and there are no caps."

76.    Another case in the Middle District of North Carolina that is very similar to this one and that has yielded discovery is <u>William Stephenson v. International Business Machines Corporation</u>, No. 17-cv-1141 ("the Stephenson Action"). The plaintiff in the Stephenson Action had an IPL that was in relevant part identical or substantially similar to Ms. Florey's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Ms. Florey. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Stephenson, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Ms. Florey, and what IBM actually paid her and why.

77.    In the Stephenson Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti; (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Benjamin

Blackwell; (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Cleo Clarke; and (4) a deposition of Randolph Moorer, a high-level IBM executive.   Together, these depositions are referred to as the "Stephenson Depositions."

78.   The witnesses in the Stephenson Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions, including those portions quoted above.

79.   Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case would "apply equally" in Stephenson's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

80.   The Stephenson Depositions establish the following facts, among many others: (a) the PowerPoint had key information about commissions that was not in the IPL, it had more specific information than the IPL, its notes stated that it is the "primary" source for information about the commissions plan, and IBM itself has testified that the PowerPoint contains "the most detailed information" about a salesperson's commission plan; (b) the witnesses testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representation in the PowerPoint that "earnings opportunities" and "payments" were "uncapped"; (c) in fact, IBM testified that salespeople can "take that to the bank" when IBM says that it does not cap and that it's "not foolish" for them to believe that, and that IBM has an "obligation" not to cap as a result; (d) internal IBM emails stated many times that IBM was "capping" Stephenson when it reduced

his commissions as it did; (e) nowhere did IBM ever define "cap," although the witnesses testified that "capping" can occur when IBM reduces a commission on one specific deal; (f) IBM admitted that, at the very least, "reasonable minds could differ about how they use or understand the term 'cap' or 'capping'"; (g) IBM reduced Stephenson's commissions in order to satisfy a secret internal budget of commissions, based on a percentage of a deal's revenue—that is, the sole reason that Stephenson's commissions were reduced and the amount of the reduction were both based only on IBM's desire to reduce the amount of commissions payable to satisfy the budget; (h) IBM focused on the "high earners" and "high achievers" when deciding whom to cap, and not, for example, on those who worked less hard relative to their peers or whose commission was disproportionate to their work; (i) IBM did not purport to cap or actually cap Mr. Stephenson based on the Significant Transactions Provision of the IPL (j) one of the witnesses testified that what IBM did to Stephenson surprised her and did not "make sense" to her; (k) Martinotti, on behalf of IBM, testified that he did not see the emails about the reasons for Mr. Stephenson's commissions reduction until his deposition and that he did not "agree" with capping to stay on budget and that doing so would be "questionable"; and (l) Mr. Stephenson's commissions were actually "earned" under the terms of the IPL when he was capped.

81.    The testimony in the prior paragraph applies equally to Ms. Florey, and in any event Ms. Florey alleges that: (a) she was reasonable to rely on IBM's promise that it would not cap her; (b) when IBM reduced her commission, it "capped" her, just like Mr. Stephenson was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped her to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not

1

2

purport to rely on or actually comply with the "Significant Transactions Provision" of the IPL.

3

82.     Another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is <u>David Swafford v. International Business Machines Corporation</u>, No. 18-cv-4916 ("the Swafford Action"). The plaintiff in the Swafford Action had an IPL that was in relevant part identical or substantially similar to Ms. Florey's IPL, and the plaintiff was shown a PowerPoint presentation with representations that were in relevant part identical or substantially similar to the representations made to Ms. Florey. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Swafford, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Ms. Florey, and what IBM actually paid her and why.

83.     In the Swafford Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti; (2) a deposition of Mr. Swafford's first-line (i.e., immediate) manager, Mark Briggs; (3) a deposition of Mr. Swafford's second-line (i.e., two levels up) manager, Richard Wirtenson; and (4) a deposition of Donald Leeke, a high-level IBM executive. Together, these depositions are referred to as the "Swafford Depositions."

84.     The witnesses in the Swafford Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

85.     Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case and the Stephenson case would "apply equally" in Swafford's case

because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

86.     The Swafford Depositions establish facts that are similar or identical to those established in the Choplin Depositions and Stephenson Depositions, as outlined above. Most importantly, they establish: (a) that Swafford was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

87.     The key testimony in the Swafford Depositions applies equally to Ms. Florey and in any event Ms. Florey alleges that: (a) she was reasonable to rely on IBM's promise that it would not cap her; (b) when IBM reduced her commission, it "capped" her, just like Mr. Swafford was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped her to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

88.     And another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is <u>Jerome Beard v. International Business Machines Corporation</u>, No. 18-cv-06783 ("the Beard Action"). The plaintiff in the Beard Action also had an IPL that was in relevant part identical or substantially similar to Ms. Florey's IPL, and the plaintiff was shown a PowerPoint presentation with representations that were in relevant part identical or substantially similar to the representations IBM made to Ms. Florey. Furthermore, upon information and belief, many of the other facts and

circumstances surrounding the commissions due to Mr. Beard, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Ms. Florey, and what IBM actually paid her and why.

89.     The witnesses in the depositions in Beard also re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

90.     Furthermore, IBM executive Inhi Cho Suh testified that much of the testimony in the Choplin case and the Stephenson case would "apply equally" in Beard's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

91.     The Beard Depositions established facts that are similar or identical to those established in the Choplin Depositions, Stephenson Depositions, and Swafford Depositions, as outlined above. Most importantly, they establish: (a) that Beard was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

92.     The key testimony in the Beard Depositions applies equally to Ms. Florey and in any event Ms. Florey alleges that: (a) she was reasonable to rely on IBM's promise that it would not cap her; (b) when IBM reduced her commission, it "capped" her, just like Mr. Beard was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped her to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM

did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

93.     In short, of all of the cases alleging facts similar to those alleged in this case, ten have yielded significant discovery, three of which proceeded in the Northern District of California. In all of the cases, the discovery has shown that the key facts alleged were in fact true—and those facts apply equally in this case.

94.     Ms. Florey has met all conditions precedent to the bringing of this action.

### FIRST CLAIM FOR RELIEF
**(Violation of the California Unfair Competition Law)**

95.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

96.     Defendant is a "person" as defined under California Business & Professions Code Section 17021.

97.     California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of the UCL.

98.     IBM's conduct, as described herein, was and is in violation of the UCL. IBM's conduct violates the UCL in at least the following ways:

    a.  by knowingly misrepresenting to Ms. Florey the uncapped nature of her commissions;

    b.  by willfully failing to pay all earned commissions wages to Ms. Florey; and

    c.  by violating other California laws, including but not limited to, California Labor Code Section 2751.

99.     IBM's specific conduct set forth in this complaint is unfair and violates Section 17200.

100.     Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

101.     IBM's conduct alleged herein caused Plaintiff to ensure that the sales representatives she managed sold as many of IBM's products and services as they could, often at the expense of quality time with her family that she would not otherwise have sacrificed had she known that IBM would not pay her the commissions she earned.

102.     Accordingly, Plaintiff has suffered injury in fact including lost money as a result of Defendant's misrepresentations.

103.     IBM should be made to disgorge these ill-gotten gains and to restore to Ms. Florey the wrongfully withheld wages to which he is entitled, as well as interest on these wages.

104.     As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid." The statute also provides that an employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee.

105.     As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751.  Furthermore, IBM violated section 2751 because IBM did not sign any

sufficient contract (and it did not sign the IPL), nor did IBM obtain a receipt from Florey for her receipt of any written contract.

106.   A violation of section 2751, can serve as a predicate violation for a claim under the UCL. Plaintiff alleges a claim against IBM for violation of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

107.   Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq.*

108.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Misrepresentation – Bio-Rad Deal)

109.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

110.   IBM, through its agents, represented to Ms. Florey that her commissions would not be capped, in at least the following instances: (1) the PowerPoints, which IBM sent to Ms. Florey to explain her commissions for the 1H 2018 sales period, and which Ms. Florey reviewed, and which were always available via the intranet[1]; and (2) the statements by IBM executives and Managers that commissions would not be capped were made directly to Ms. Florey at the beginning

---

[1] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

of each sales period, including the beginning of 1H 2018, when they discussed commissions and compensation for that period.

111.  More specifically, the commissions department informed Ms. Florey that IBM "can't cap commissions."

112.  IBM's representations to Ms. Florey that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Ms. Florey that her commissions would not be capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees and understand their own commissions plans. IBM represented that Ms. Florey's commissions would not be capped in virtually all IBM documents that explained how her commissions would be paid.

113.  Those representations were false.

114.  Those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Ms. Florey in making those misrepresentations. Simply put, IBM knew that Ms. Florey's commissions might be and would be capped, even though it told her in all of these instances that they would not be capped.

115.  Ms. Florey reasonably and justifiably relied on the representations of IBM.  Notably, the representations were made after Ms. Florey signed the IPL, including those in the PowerPoints. Ms. Florey reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Ms. Florey known that she would not be paid what she was promised and what she expected,

she would have worked differently at IBM, in commensuration with her actual compensation, and/or she would have sought another job that paid her what her efforts were worth and/or did not cap commissions.

116.   The reasonableness of Ms. Florey's reliance is supported by, among other things, the fact that her manager Ms. Henkels also believed that her commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; the admissions in the Swafford case by IBM and Mr. Swafford's three managers; and the admissions in the Beard case by IBM and IBM executive Inhi Cho Suh. Each of these individuals, and IBM itself, admitted that it was reasonable for a sales employee to rely on IBM's representations that commissions were uncapped. Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Ms. Florey, which further supports the reasonableness of Florey's reliance.

117.   Furthermore, IBM fraudulently concealed from Ms. Florey that it would and did cap commissions, the fact that it had internal budgets for commissions, and all aspects of its practice of capping commissions. IBM had a duty to speak because (a) it chose to speak by telling Ms. Florey and others that they would not be capped, thereby taking on a duty to make a full and fair disclosure of facts concerning the matters on which IBM chose to speak; and (b) it took affirmative steps to conceal material facts from Ms. Florey. IBM failed to fulfill the duty to speak and make a full and fair disclosure of the facts. IBM concealed the facts with the intent to deceive Ms. Florey, who was in fact deceived. Ms. Florey justifiably relied

on IBM's silence about those facts, and she was injured as a result of IBM's fraudulent concealment in an amount exceeding $75,000.

118.   Ms. Florey was damaged by IBM's fraudulent statements with respect to how she would be paid on the Bio-Rad Deal in an amount exceeding $75,000.

## THIRD CLAIM FOR RELIEF
### (Alternative Claim - Negligent Misrepresentation – Bio-Rad Deal)

119.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

120.   Ms. Florey alleges this claim in the alternative to the claim for fraudulent misrepresentation.

121.   IBM, through its agents, represented to Mr. Reingold that his commissions would not be capped, in at least the following instances: (1) the PowerPoints, which, IBM sent to Ms. Florey to explain her commissions for the 1H 2018 sales period, and which Ms. Florey reviewed, and which were always available via the intranet[2]; and (2) the statements by IBM executives and Managers that commissions would not be capped were made directly to Ms. Florey at the beginning of each sales period, including the beginning of 1H 2018, when they discussed commissions and compensation for that period.

122.   More specifically, the commissions department informed Ms. Florey that IBM "can't cap commissions."

123.   IBM's representations to Ms. Florey that commissions would not be capped were statements of IBM's commissions policy. When IBM executives, managers, and other employees told Ms. Florey that her commissions would not be

---

[2] The PowerPoints were created by, and with the guidance and input of, IBM managers at the highest levels of management and represents a binding representation by IBM about commissions.

capped, they simply repeated what IBM had told them was IBM's official policy, which is set forth in the PowerPoints and on training materials that IBM uses to instruct managers how they should explain IBM's commissions policy to IBM sales employees and understand their own commissions plans. IBM represented that Ms. Florey's commissions would not be capped in virtually all IBM documents that explained how her commissions would be paid. IBM's agents made the representation negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Ms. Florey rely on the statements, and dhe reasonably and justifiably relied on the representations of IBM.

124. Notably, some or all of the representations were made after Ms. Florey signed the IPL, including those in the PowerPoint, and those by IBM manager Ms. Henkels. Ms. Florey reasonably and justifiably relied on the representations by, among other things, continuing to work hard and encourage her sales representatives to sell as much software and services as possible for the benefit of IBM.

125. The reasonableness of Ms. Florey's reliance is supported by, among other things, the fact that Ms. Florey's manager Ms. Henkels also believed that her commissions were uncapped, that an IBM commissions department employee believed commissions were uncapped, the admissions in the Choplin case by IBM, Mr. Choplin's two managers, and former IBM executive Mark Dorsey; the admissions in the Stephenson case by IBM and Mr. Stephenson's three managers; and the admissions in the Swafford case by IBM and Mr. Swafford's three managers. Each of those individuals, and IBM itself, admitted that it was reasonable for a sales employee to rely on IBM's representations that commissions were uncapped.

Moreover, Mr. Choplin, Mr. Stephenson, and Mr. Swafford also testified that they relied on the same promises of uncapped commissions as Ms. Florey, which further supports the reasonableness of Ms. Florey's reliance.

126.    Had Ms. Florey known that she would not be paid what she was promised and what she expected, she would have worked differently at IBM, in commensuration with his actual compensation, and/or she would have sought another job that paid her what her efforts were worth and/or did not cap commissions. Had Ms. Florey known that she would be capped as she was, she would have worked differently at IBM so as to maximize her compensation.

127.    IBM owed Ms. Florey a duty of care in making the representations.

128.    Ms. Florey reasonably and justifiably relied on the representations of IBM.

129.    Ms. Florey was damaged by IBM's negligent misrepresentations.

130.    Ms. Florey has been damaged by IBM's negligence with respect to how he would be paid on the Bio-Rad Deal in an amount exceeding $75,000.00.

### FOURTH CLAIM FOR RELIEF
### (Alternative Claim – Quantum Meruit)

131.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

132.    Ms. Florey rendered valuable consideration to IBM, in the form of work performed to help her sales representatives close the Bio-Rad, for which she has not been paid. The consideration has a reasonable value of *at least* $166,580.62 although the exact amount is for the jury.

133.    At the time that Ms. Florey performed the work for this deal she reasonably expected to be paid by IBM.  IBM received and benefited from the work

with knowledge or reason to know that Ms. Florey expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

134.   Ms. Florey is entitled under the doctrine of quantum meruit to recover damages from IBM in the amount of *at least* $75,000.

**FIFTH CLAIM FOR RELIEF**
**(Alternative Claim - Unjust Enrichment)**

135.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

136.   At the specific request of IBM and for its use and benefit, Ms. Florey has performed work for IBM in the form of managing her sales representatives making sales of its software and services to Bio-Rad.

137.   The value of the work performed for IBM by Ms. Florey for which she has not been paid is *at least* $166,580.62, although the exact amount is for the jury.

138.   During and since the performance of the work by Ms. Florey, IBM has failed to pay her and there is due and owing to Ms. Florey from IBM, a principal sum amount of *at least* $166,580.62.

139.   Despite Ms. Florey being owed in excess of $166,580.62, IBM has failed and refused to pay the same or any part of it.

140.   As a result of IBM's refusal to pay Ms. Florey the above-stated sum due and owing to her, IBM has become unjustly enriched in the amount of *at least* $75,000.

**SIXTH CLAIM FOR RELIEF**
**(Punitive Damages)**

141.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

142.    The actions and conduct of IBM, as set forth herein, entitle Ms. Florey to compensatory damages, and are accompanied by aggravating factors which caused and relate to Ms. Florey's injuries which give rise to her claim for compensatory damages.

143.    This conduct, as set forth herein, includes, among other things, fraud.

144.    IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Florey prays the Court for the following relief:

1.    That Ms. Florey have and recover from IBM for violations of the California Labor Code in an amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

2.    That Ms. Florey have and recover from IBM for violations of the California Unfair Competition Law injunctive relief authorized by Business and Professions Code Sections 17202 and 17203 and restitution of her improperly withheld commissions, including interest, costs, and attorneys' fees as allowed by law;

3.    Ms. Florey have and recover from IBM for fraudulent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

4.    Ms. Florey have and recover from IBM for negligent misrepresentation in an amount exceeding $75,000, and interest and costs as allowed by law;

5.      Ms. Florey have and recover from IBM for quantum meruit or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

6.      That Ms. Florey be awarded attorneys' fees pursuant to California Labor Code § 218.5;

7.      That Ms. Florey be awarded punitive damages;

8.      That all costs of this action be taxed against IBM; and

9.      That the Court award Ms. Florey such other and further relief as this Court may deem just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted, this the 3rd day of September 2021.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

BY: */s/ Alex R. Straus*
Alex R. Straus (SBN 321366)
280 Beverly Hills Drive, Penthouse
Beverly Hills, CA 90212
Telephone: 310-450-9689
Facsimile: 310-496-3176
Email: astraus@milberg.com

Matthew E. Lee*
Mark Sigmon*
Jeremy R. Williams*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile: 919-600-5035
Email: mlee@milberg.com
Email: msigmon@milberg.com
Email: jwilliams@milberg.com

*Counsel for Plaintiff*

*motion to be admitted pro hac vice
forthcoming